# EXHIBIT A

## AFFIDAVIT OF SPECIAL AGENT MICHAEL PICKETT

I, Michael Pickett, declare and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Senior Special Agent ("SSA") with the United States Secret Service ("USSS") and have been employed as such since March 2003.  From 2013 to 2019, I was assigned to the Technical Security Division in Washington, D.C.  Previously, I was part of the USSS Electronic Crime Special Agent Network Intrusion Responder Program in 2005, and the USSS Computer Forensics Program in 2007.  I also attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, and the United States Secret Service Special Agent Training Course at the James J.  Rowley Training Center in Beltsville, Maryland.

2.      I am currently assigned to the Boston Field Office, Digital Evidence Forensic Lab, where I conduct financial crime investigations, including investigations of violations of 18 U.S.C. § 1343 (fraud by wire) and 18 U.S.C. § 1956 (laundering of monetary instruments).  In connection with these investigations, I have conducted or participated in numerous field interviews of suspects, witnesses and victims, electronic and physical surveillance, and have researched financial documents and information relating to cryptocurrency transactions and fiat money transfers between financial institutions.  Through my training and experience, I have become familiar with various financial frauds and schemes such as bank frauds, wire frauds and mail frauds.

## PURPOSE OF AFFIDAVIT

3.     I submit this affidavit in support of a Verified Complaint for Forfeiture *in Rem* against the following assets:

a.   303,992.547 USDT[1] and 100.896 BNB[2] seized from Binance account associated with User ID xxxx4375 on April 13, 2023; and,

b.   108,551.008 USDT seized from Binance account associated with User ID xxxxx5891 on April 13, 2023

(collectively, the "Defendant Property").

4.     As set forth below, there is probable cause to believe that the Defendant Property contains proceeds traceable to a violation of 18 U.S.C. § 1343 (fraud by wire) and is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).  Furthermore, there is probable cause to believe that the Defendant Property is property involved in a violation of 18 U.S.C. § 1956 (laundering of monetary instruments) and is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).  The Defendant Property was seized pursuant to seizure warrants issued in the District of Massachusetts (Hennessy, J.) on April 12, 2023.

5.     This affidavit is based on my personal knowledge, information provided by other law enforcement officers and government employees, and information gathered during this investigation including interviews of witnesses, the review of documents, and conversations with other law enforcement officers.  This affidavit is not intended to set forth all of the information that I have learned during this investigation but includes only the information necessary to establish probable cause for the forfeiture of the Defendant Property.

---

[1] "USDT" is the abbreviation for Tether, a blockchain-based cryptocurrency whose tokens operate as a stablecoin, indicating that each token is equivalent in value to one U.S. dollar.

[2] Binance coin ("BNB") is a cryptocurrency established by the Binance cryptocurrency exchange and may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

## BACKGROUND ON CRYPTOCURRENCY

6.      Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

7.      Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.[3]  Examples of cryptocurrency are Bitcoin, Litecoin, and Ether.  Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.  Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object.  Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.  Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[4]  Cryptocurrency is not illegal in the United States.

8.      Tether ("USDT") is an alternative type of cryptocurrency or altcoin token. Payments or transfers of value made with Tether are recorded in the blockchain network, but unlike decentralized cryptocurrencies like Bitcoin, Tether has some anatomical features of

---

[3] Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.

[4] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

centralization.  One centralized feature is that Tether is a stablecoin or a fiat-collateralized token that is backed by fiat currencies, or currencies issued by governments like the dollar or the euro. Tether is backed with a matching one to one fiat amount, making it much less volatile than its counterpart, Bitcoin.  Due to Tether's stable nature, wallet holders typically use a fundamental strategy to hedge their cryptocurrency holdings into Tether to hedge their receipt or earnings value so it is not affected by the rest of the volatile cryptocurrency market.

9.       Binance Coin ("BNB") is a type of cryptocurrency established by the Binance cryptocurrency exchange and may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

10.      Cryptocurrency is stored in a virtual account called a wallet.  Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency.  A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key").  A public address is represented as a case-sensitive string of letters and numbers, 26-36 characters long.  Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN— needed to access the address.  Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

11.      Although cryptocurrencies such as Bitcoin, Tether, Binance Coin, and Ethereum have legitimate uses, cryptocurrency can also be used by individuals and organizations for criminal purposes such as money laundering, and it is an oft-used means of payment for illegal

goods and services.  By maintaining multiple wallets, those who use cryptocurrency for illicit

purposes can attempt to thwart law enforcement's efforts to track transactions.

12.      Exchangers and users of cryptocurrencies store and transact their cryptocurrency

in a number of ways, as wallet software can be housed in a variety of forms, including on a

tangible, external device ("hardware wallet"), downloaded to a PC or laptop ("desktop wallet"),

with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a

smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as

an online account associated with a cryptocurrency exchange.  Because these desktop, mobile,

and online wallets are electronic in nature, they are located on mobile devices (*e.g.*, smart phones

or tablets) or at websites that users can access via a computer, smart phone, or any device that

can search the Internet.  Moreover, hardware wallets are located on some type of external or

removable media device, such as a USB thumb drive or other commercially available device

designed to store cryptocurrency (*e.g.*, Trezor, Keepkey, or Nano Ledger).  In addition, paper

wallets contain an address and a QR code[5] with the public and private key embedded in the code.

Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper

printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung

together in a phrase) or a complex password.  Additional security safeguards for cryptocurrency

wallets can include two-factor authorization (such as a password and a phrase).  I also know that

individuals possessing cryptocurrencies often have safeguards in place to ensure that their

cryptocurrencies become further secured in the event that their assets become potentially

vulnerable to seizure and/or unauthorized transfer.

---

[5] A QR code is a matrix barcode that is a machine-readable optical label.

13.     Cryptocurrency "exchangers" and "exchanges" are individuals or companies that exchange bitcoin for other currencies and cryptocurrencies, including U.S. Dollars and Tether. According to Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[6] Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law).  From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions.  For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account.  As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers stealth and anonymity.  These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail.  Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1–2%).

---

[6] See "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-persons-administering.

14.     Binance Capital Management Co., Ltd.  ("Binance") is a Cryptocurrency exchange and custodian that allows users to buy, sell and store digital assets.  They hold a Money Service Business Registration in the United States.  Their registration shows an address of P.O. Box 472, Harbour Place, 2nd Floor, North Wing, 103 South Church Street, George Town, Grand Cayman, KY1-1106.

## PROBABLE CAUSE

15.     As set forth below, there is probable cause to believe that the Defendant Property is subject to forfeiture as proceeds obtained through violations of 18 U.S.C. § 1343 (fraud by wire) and as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (laundering of monetary instruments).  Pursuant to 18 U.S.C. § 981(a)(1)(C), "any property, real or personal, which constitutes or is derived from proceeds traceable to a . . . 'specified unlawful activity' or a conspiracy to commit such offense" is subject to civil forfeiture.  Pursuant to 18 U.S.C. § 1961(1), as incorporated by 18 U.S.C. § 1956(c)(7)(A), violations of 18 U.S.C. § 1343 are a specified unlawful activity.  Furthermore, pursuant to 18 U.S.C. § 981(a)(1)(A), "any property, real or personal, involved in a transaction or attempted transaction" in violation of section 18 U.S.C. § 1956(a)(1)(B)(i), "or any property traceable to such property," is also subject to civil forfeiture.  It is a violation of 18 U.S.C. § 1956(a)(1)(B)(i) (laundering of monetary instruments) to conduct or attempt to conduct a financial transaction "knowing that the transaction is designed in whole or in part" to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

### *The Scheme to Defraud*

16.     On or about September 6, 2022, Victim-1—a retired computer engineer and a Massachusetts resident—received a message on the Line messaging application installed on his

8

Apple iPhone, from a user ID containing Chinese characters that appeared to be a misrouted message intended for a recipient other than Victim-1. The message purportedly came from an individual named Wen Zhang ("ZHANG") who claimed to be a human resource manager and IT programmer employed by a company located in Vancouver, Canada. Victim-1 and ZHANG engaged in frequent conversation thereafter.

17.     ZHANG went on to claim that she worked with a cryptocurrency contract trader in China, who would alert her of profitable trading opportunities, and she invited Victim-1 to join her in trading. From on or about November 1, 2022, until on or about December 9, 2022, Victim-1 invested over $1,000,000 in cryptocurrency at ZHANG's direction into the "GateEx" investment platform.

18.     In messages on September 26, 2022, and September 27, 2022, ZHANG discussed the contract trader based in China, touted her and the contract trader's experience, and claimed that they made profits in the range of 15 to 20%.

19.     On or about September 28, 2022, ZHANG provided Victim-1 with the website, https://www.gateexpro.xyz/wap, and indicated it was a cryptocurrency exchange.

20.     On or about September 29, 2022, ZHANG instructed Victim-1 to download and install the "imToken" application onto his iPhone and open an account. Victim-1 complied and proceeded to open an imToken account, which can be used to hold cryptocurrency.

21.     ZHANG subsequently relayed to Victim-1 that in order for him to utilize the "GateEx" platform, Victim-1 needed to transfer money into Victim-1's Crypto.com account, purchase Ethereum ("ETH") cryptocurrency with the funds, and then send the ETH cryptocurrency to Victim-1's imToken account. ZHANG instructed Victim-1 to then transfer the

ETH from the imToken account to the "GateEx" platform. ZHANG provided Victim-1 with step-by-step instructions necessary to complete this process.

22.     ZHANG periodically informed Victim-1 of "trading opportunities" and provided him with step-by-step instructions to complete the transaction on the "GateEx" website. Following these instructions, Victim-1's "GateEx" account balance appeared to reflect an increase in value, which led Victim-1 to believe his investment was growing.

23.     ZHANG told Victim-1 that the trading window would be small and that he would need to add even more funds to earn higher profits. ZHANG promised Victim-1 significant profits and personal wealth.

24.     During their communications, ZHANG provided two additional website addresses for the "GateEx" website, shown below:

     a.  https://www.gateex-w.com/; and

     b.  https://www.gateexproq.com/wap.

25.     During their communications, ZHANG also instructed Victim-1 to open an account at the FTX cryptocurrency exchange and to also use this account to receive funds for transfer into ETH cryptocurrency and for eventual transfer to the imToken account.

26.     Victim-1 made a total of twenty-six (26) cryptocurrency transfers to "GateEx" at the direction of ZHANG totaling approximately 1,066.215 ETH and 19,715 USDT, as shown in Figures 1, 2, 3, and 4.

27.     Victim-1 stated that on December 16, 2022, his "GateEx" account showed a balance of 1,127,540.89 USDT and that he attempted to withdraw $30,000 from this account, but that the request was rejected. By December 26, 2022, Victim-1 said he could no longer access his assets page or the customer service function on "GateEx."

28.     Victim-1 then filed a report with law enforcement.

29.     On February 21, 2023, USSS investigators conducted a thorough, open-source search for www.gateexpro.xyz/wap but were unable to identify a functioning website and instead received the message: "www.gateexpro.xyz's DNS address could not be found...".

30.     A subsequent search utilizing an open-source cyber investigative platform showed gateexpro.xyz was first registered on or about September 8, 2022.  Based on my training and experience, as well as conversations with other investigators familiar with investment platforms, it is not common for a legitimate investment platform website to remain functional for less than six months.

31.     Additional open-source searches identified a website post warning others not to use the website www.gateexpro.xyz, stating that it is a suspected scam, and a separate search of law enforcement databases identified reports of fraud associated with www.gateexpro.xyz.

32.     On February 21, 2023, USSS investigators also conducted a thorough, open-source search for www.gateex-w.com but, as they had experienced with www.gateexpro.xyz/wap, were unable to identify a functioning website and instead received a message indicating that the DNS address was unable to be found.

33.     USSS investigators also conducted a thorough open-source search for www.gateexproq.com/wap. When investigators accessed the site, they found several discrepancies including various blank webpages, the inconsistent use of capitalization and spacing between text, and an "About" section that appeared to reference a different, non-functional website. Furthermore, a search of law enforcement databases identified multiple reports of fraud associated with gateexproq.com/wap.

34.     Based on my training and experience, as well as conversations with other investigators familiar with investment platforms, the discrepancies and inconsistencies identified with regard to the above websites are not typical, or to be expected, for legitimate investment platforms.

35.     Accordingly, I have probable cause to believe that Victim-1 was fraudulently induced to transfer funds to a scam investment platform, *i.e.*, wire fraud, in violation of 18 U.S.C. § 1343.

### *The Flow of Funds:*

36.     Through subsequent analysis, law enforcement traced the cryptocurrency that Victim-1 transferred from his Crypto.com and FTX accounts, through his imToken account, to Binance account associated with User ID xxxx4375 ("Binance 4375") and Binance account associated with User ID xxxxx5891 ("Binance 5891"). This property was traced based on the last in-first out ("LIFO") accounting principle, which assumes that the last, or most recent, incoming assets are the first expended or sent out. *See United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1160 (2d Cir. 1986) (government can establish *prima facie* case for forfeiture by relying on either the "last-in, last-out" approach or the "last-in, first-out" approach).

37.     The 26 transfers out of Victim-1's account at imToken are reflected in Figures 1, 2, 3, and 4 below, with times shown in UTC[7]:

| Date: 10/01/2022 04:54:23 |
| --- |
| Amount ETH: 14.7750 |
| Sent to wallet address: 0x4a88b6aab27b2a24320451d7c3083beac14faeda (Wallet starting in 0x4a88) |
| Transaction Hash: 0xfe09ab08f420811caac1e085bcc3480fc4bb058c5c71660add75ddb73e82c34e |
| |
| Date: 10/03/2022 21:07:47 |

_____

[7] UTC is Universal Time Coordinated, also known as Coordinated Universal Time or Greenwich Mean Time.

| Amount ETH: 16.3750 |
|---|
| Sent to wallet address: 0x4a88b6aab27b2a24320451d7c3083beac14faeda (Wallet starting in 0x4a88) |
| Transaction Hash: 0x0074003efe4d55d36a5fc6af2dfba04e66e8480c3c7ee4b9650f42e32361860c |
| |
| **Date: 10/07/2022 19:43:23** |
| Amount ETH: 51.7160 |
| Sent to wallet address: 0x4a88b6aab27b2a24320451d7c3083beac14faeda (Wallet starting in 0x4a88) |
| Transaction Hash: 0x9b87ed4fffea5251eb9445dd47df5a432c48c7d9f36ff099053f08bbe510c6bc |
| |
| **Date: 10/12/2022 01:59:59** |
| Amount ETH: 15.1820 |
| Sent to wallet address: 0x4a88b6aab27b2a24320451d7c3083beac14faeda (Wallet starting in 0x4a88) |
| Transaction Hash: 0xbf12b2b1c0b19a7877c712e2da1b584148e68f5e58bcc9e0c93af03820910fa3 |
| |
| **Date: 10/13/2022 17:27:23** |
| Amount ETH: 150.0000 |
| Sent to wallet address: 0xc77b57ba52588dc9fc2881e6f7818c2f7ba02b72 (Wallet starting in 0xc77b) |
| Transaction Hash: 0x033b9a1143ae7eff6fc22ef3deb868103b94bd318254d24660ccac1d1f3646cf |
| |
| **Date: 10/18/2022 20:09:47** |
| Amount ETH: 126.6650 |
| Sent to wallet address: 0xc77b57ba52588dc9fc2881e6f7818c2f7ba02b72 (Wallet starting in 0xc77b) |
| Transaction Hash: 0x010ba620061fd9a4c4c5e69363b442072608794dd618ea18fa590d7affc136ed |
| |
| **Date: 10/22/2022 01:33:35** |
| Amount ETH: 1.5220 |
| Sent to wallet address: 0xc77b57ba52588dc9fc2881e6f7818c2f7ba02b72 (Wallet starting in 0xc77b) |
| Transaction Hash: 0x16fdf5409b2129fc66aac5712a57b7ddedbbb3fa60feb6961b444d7a7f571038 |
| |
| **Date: 10/25/2022 00:22:59** |
| Amount ETH: 110.8800 |
| Sent to wallet address: 0xc77b57ba52588dc9fc2881e6f7818c2f7ba02b72 (Wallet starting in 0xc77b) |
| Transaction Hash: 0xb3bc08441351e265b49f13ec9e298d3853d882b296bf75ee43cd5da47b51951e |

**Figure 1**

| **Date: 10/26/2022 21:12:35** |
|---|
| Amount ETH: 15.9500 |
| Sent to wallet address: 0xc77b57ba52588dc9fc2881e6f7818c2f7ba02b72 (Wallet starting in 0xc77b) |
| Transaction Hash: 0x2dc2283f90eb08579b4277ca27c18547681e68bc906244e574192ab313f2f747 |

13

| **Date: 10/27/2022 22:11:23** |
|---|
| Amount ETH: 6.5100 |
| Sent to wallet address: 0xc77b57ba52588dc9fc2881e6f7818c2f7ba02b72 (Wallet starting in 0xc77b) |
| Transaction Hash: 0x2178360095c321ea196718a8f08ec11e4e4f3bb9bc106607548ec754e0f3a3b7 |

| **Date: 10/28/2022 23:41:35** |
|---|
| Amount ETH: 15.9170 |
| Sent to wallet address: 0xc77b57ba52588dc9fc2881e6f7818c2f7ba02b72 (Wallet starting in 0xc77b) |
| Transaction Hash: 0xa2bc04245aaccf7861d01393aac5ead37fe9752863d7dfa0e789b39b473e16f6 |

| **Date: 10/31/2022 22:01:47** |
|---|
| Amount ETH: 15.8490 |
| Sent to wallet address: 0xc77b57ba52588dc9fc2881e6f7818c2f7ba02b72 (Wallet starting in 0xc77b) |
| Transaction Hash: 0x3032168631c389d2da453877543a2133453737d1eb3e88b154add1376695c20f |

| **Date: 11/02/2022 19:23:23** |
|---|
| Amount ETH: 34.5100 |
| Sent to wallet address: 0xc77b57ba52588dc9fc2881e6f7818c2f7ba02b72 (Wallet starting in 0xc77b) |
| Transaction Hash: 0x5c7a57fa56eb9a47f4653badbe545c45ad05053f929e2475e381f13154723d5d |

| **Date: 11/09/2022 21:50:59** |
|---|
| Amount ETH: 38.1300 |
| Sent to wallet address: 0xa0e2be1d186914b632fd0d4fb3d72ded44244369 (Wallet starting in 0xa0e2) |
| Transaction Hash: 0x1bc365e049a378abf8403ebd1978ddc58a4ef6695e1876e687ac946ce2e83ee8 |

| **Date: 11/09/2022 23:17:11** |
|---|
| Amount ETH: 27.9500 |
| Sent to wallet address: 0xa0e2be1d186914b632fd0d4fb3d72ded44244369 (Wallet starting in 0xa0e2) |
| Transaction Hash: 0xb7b4c34f3c6f776abb4c79993bbaa75d89493bda0425327fa4f323ac66fc1b43 |

| **Date: 11/09/2022 23:24:35** |
|---|
| Amount USDT: 19,715 |
| Sent to wallet address: 0xa0e2be1d186914b632fd0d4fb3d72ded44244369 (Wallet starting in 0xa0e2) |
| Transaction Hash: 0x1c8595dc3ce199ea289240e51ed11d3c360350a62a6e302ad09df1a8f0516985 |

**Figure 2**

| **Date: 11/10/2022 02:49:11** |
|---|
| Amount ETH: 113.5210 |
| Sent to wallet address: 0xa0e2be1d186914b632fd0d4fb3d72ded44244369 (Wallet starting in 0xa0e2) |

| |
|---|
| Transaction Hash: 0x31ff743ecb54fb9a5a06687a47f5d9fbf7e308610c191f007a344923cc7626f2 |
| |
| **Date: 11/17/2022 20:28:59** |
| Amount ETH: 69.0220 |
| Sent to wallet address: 0xa0e2be1d186914b632fd0d4fb3d72ded44244369 (Wallet starting in 0xa0e2) |
| Transaction Hash: 0x8185b06b73a65be848daeb40ac0eedcecef74f53474215c6e3027799729e4204 |
| |
| **Date: 11/21/2022 21:23:47** |
| Amount ETH: 13.2470 |
| Sent to wallet address: 0xe3ed9290088da09797686c70e0f8f6485df3173b (Wallet starting in 0xe3ed) |
| Transaction Hash: 0xc96819b8a09a89c7c38a301d917ad232eb1cc4d54e6c34970921c49e9fea312b |
| |
| **Date: 11/22/2022 21:23:23** |
| Amount ETH: 12.9960 |
| Sent to wallet address: 0xe3ed9290088da09797686c70e0f8f6485df3173b (Wallet starting in 0xe3ed) |
| Transaction Hash: 0x9a44c021d25aa3345f362cc7c20cef231d1713fbc82f5e6989a8d6f60f742034 |
| |
| **Date: 11/24/2022 14:03:47** |
| Amount ETH: 16.0350 |
| Sent to wallet address: 0xe3ed9290088da09797686c70e0f8f6485df3173b (Wallet starting in 0xe3ed) |
| Transaction Hash: 0xb7921c1971f36b528c3c25e1f5f58b564f7828e5837399daf2109a7dfa4e462b |
| |
| **Date: 11/30/2022 17:33:47** |
| Amount ETH: 31.0665 |
| Sent to wallet address: 0xe3ed9290088da09797686c70e0f8f6485df3173b (Wallet starting in 0xe3ed) |
| Transaction Hash: 0x80b013ee997c128b3240598f70fa1e24e266cfc70251561e1c6f29fd82f75521 |
| |
| **Date: 12/06/2022 18:36:35** |
| Amount ETH: 31.2940 |
| Sent to wallet address: 0x0f9579b5408c7f6b6ea8c75af2202651733c74c1 (Wallet starting in 0x0f95) |
| Transaction Hash: 0xd9f6e6b32052d34b0651494b544e8244a4d3888a97f4db493c5f373fb52b1623 |
| |
| **Date: 12/08/2022 03:43:47** |
| Amount ETH: 7.9430 |
| Sent to wallet address: 0x0f9579b5408c7f6b6ea8c75af2202651733c74c1 (Wallet starting in 0x0f95) |
| Transaction Hash: 0xaa276306e7cf41e5538346e42c2c82a17222d8ddcfaa57b7ada0f64affc98216 |

**Figure 3**

| Date: 12/08/2022 22:27:35 |
| --- |
| Amount ETH: 121.4780 |
| Sent to wallet address: 0x0f9579b5408c7f6b6ea8c75af2202651733c74c1 (Wallet starting in 0x0f95) |
| Transaction Hash: 0x0664198d876aa078508420497f350796946c456a8d387a4de5e1d6aeb803c093 |
| |
| Date: 12/09/2022 17:29:59 |
| Amount ETH: 7.6810 |
| Sent to wallet address: 0x0f9579b5408c7f6b6ea8c75af2202651733c74c1 (Wallet starting in 0x0f95) |
| Transaction Hash: 0x092d33ac1ca60f84c18273fa37b7985f1ee49177eeb772e80b02cdd5c9770a96 |

**Figure 4**

### *The Flow of Funds to Binance 4375:*

38.     After receiving approximately 477.803 ETH of Victim-1's funds, the controller of wallet address beginning in 0xc77b remitted the funds to a series of intermediary wallets before a portion of the victim's funds were converted into approximately 9,910 USDT and ultimately transferred to the wallet address beginning in 0xbebd.  I obtained account records from Binance indicating this transaction corresponds to Binance 4375, as described more fully in the paragraphs below.

39.     A depiction of the transactions to the intermediary wallets involving Victim-1's funds can be found in Figure 5 below, with times shown in UTC:

| Date: 10/27/2022 22:25:59 |
| --- |
| Amount USDT: 187,736 |
| Sent to wallet address: 0x7B9a5d1bd2Fbc798288d464Be5a5d9DC3a5781F4 (Wallet starting in 0x7b9a) |
| Transaction Hash: 0xf1e31b92530c13b663b463cc4a1fb0762724ed30c5ec1fb7f4267ab3316b7327 |
| |
| Date: 10/28/2022 05:04:59 |
| Amount USDT: 654,390 |
| Sent to wallet address: 0x3C9c8419Dc58DCB42E25244c9e9f415DA7CC450B (Wallet starting in 0x3c9c) |
| Transaction Hash: 0xb2cb98f5abf46345ae413c2a08313e3ea81896e3aec87538be80e6450e32d100 |
| |
| Date: 10/28/2022 08:26:11 |
| Amount USDT: 507,614 |

| Sent to wallet address: 0xE1C7d4cA628D1fb72CD120B9b7a065732aBc4511 (Wallet starting in 0xe1c7) |
|---|
| Transaction Hash: 0xaf2ea27ebb5dd89e5ba37c1c3abf1799172c721058075d810962d4af2c105e25 |
| |
| **Date: 10/31/2022 04:18:11** |
| Amount USDT: 600,000 |
| Sent to wallet address: 0x101F857ce51007fD77c7b22557D73EbDF1E9a592 (Wallet starting in 0x101f) |
| Transaction Hash: 0x30743c19af36672a4598b9a6ba75df9ee80a0fcf10b28e41cdb7fe02a607f248 |
| |
| **Date: 10/31/2022 04:21:11** |
| Amount USDT: 600,000 |
| Sent to wallet address: 0xbebd1A32d2dC59b8AB1372778cC244Fb54060798 (Wallet starting in 0xbebd) |
| Transaction Hash: 0xd5f7589d7d7c980e1021fcaf4e7ed5e30ea3395258f33bfdd1cf9f4888566ee1 |

**Figure 5**

40.     A graphical depiction of the transfers identified in Figure 5 above is reflected in Attachment A.

### *The Flow of Funds to Binance 5891:*

41.     After receiving approximately 98.048 ETH of Victim-1's funds, the controller of wallet address beginning in 0x4a88 remitted the funds to a series of intermediary wallets before a portion of the victim's funds were converted into approximately 19,408 USDT and ultimately transferred to the wallet address beginning in 0x57c2.  I obtained account records from Binance indicating that this transaction corresponds to Binance 5891, as described more fully in the paragraphs below.

42.     A depiction of the transactions to the intermediary wallets involving Victim-1's funds can be seen in Figure 6 below, with times shown in UTC:

| **Date: 10/12/2022 03:04:59** |
|---|
| Amount USDT: 44,253 |
| Sent to wallet address: 0x7B9a5d1bd2Fbc798288d464Be5a5d9DC3a5781F4 (Wallet starting in 0x7b9a) |
| Transaction Hash: 0xd1608c8d233d8b27db1831ac2c6b4709122418c5ced70f6cbe4aad42813cdbe4 |
| |
| **Date: 10/12/2022 04:45:47** |

| Amount USDT: 581,900 |
| Sent to wallet address: 0x3C9c8419Dc58DCB42E25244c9e9f415DA7CC450B (Wallet starting in 0x3c9c) |
| Transaction Hash: 0x60100885c4229601fc40addc1e99f8a0f876b0a3f4263118bdfcda6a8d259798 |
| |
| **Date: 10/13/2022 08:09:59** |
| Amount USDT: 341,280 |
| Sent to wallet address: 0x66e8D371c62920d66Ce0856fE5B8d338F87645B9 (Wallet starting in 0x66e8) |
| Transaction Hash: 0x5ce7fde325440a18c554c54b4d5abd3aeb4cf82e7c2399f3696d90469c8843b6 |
| |
| **Date: 10/19/2022 09:12:11** |
| Amount USDT: 40,000 |
| Sent to wallet address: 0x57C25D849258e03Cf72Edb94Fdf27462B63Ac5c9 (Wallet starting in 0x57c2) |
| Transaction Hash: 0x31f8c06b628aa9282e2922beeceb18f2212517af8fa0a96d040abdaf80114311 |

**Figure 6**

43.     A graphical depiction of the transfers identified in Figure 6 above is reflected in Attachment B.

### ***Laundering of Fraud Proceeds to the Subject Binance Accounts***

44.     The scheme detailed in this affidavit is largely consistent with that of a criminal organization employing an emerging fraud trend commonly referred to as "Pig Butchering." A Pig-Butchering scheme often begins with a scammer sending a victim a seemingly misrouted message. From there, the scammer establishes a pattern of communication that evolves into a more personal relationship with the victim, using manipulative tactics similar to those employed in online romance scams.

45.     The victims in Pig Butchering schemes are referred to as "pigs" by the scammers because the scammers often use elaborate storylines to "fatten up" their victims into believing they are in a relationship. Once the victim reaches a certain point of trust, they are then brought into a cryptocurrency investment scheme and provided fabricated information to bolster the scheme's legitimacy and to help reduce any skepticism the victim might have about the scam. The fabricated information can include, but is not limited to:

18

a. a fake investment platform held on a website or mobile application that displays fictious investment options. In reality, the website or application has limited functionality and does not allow the user any access to a cryptocurrency wallet;

b. fabricated investment gains that are displayed on the investment platform website or mobile application. In actuality, the investment platform does not exist; and

c. a demand to pay the fake investment platform "taxes" or "fees" on the value of the account before they can withdraw funds (and, even when the victims pay these "taxes" or "fees", the victims will be unable to withdraw their funds).

46. The "butchering" or "slaughtering" of the victim occurs once the victim's assets, or funds, are stolen by the criminal, or criminals, ultimately causing the victim financial and emotional harm.

47. In this instance, and as described above, Victim-1 was contacted by an online persona who claimed to have investment experience and knowledge of lucrative cryptocurrency trading opportunities. Based on my knowledge and experience conducting cryptocurrency fraud investigations, I know that criminal organizations often operate in multiple tiers of responsibility. Most often, the individual that communicates directly with the victim is typically on a lower tier of responsibility in the criminal organization, whereas individuals receiving funds at the end of the scheme are those who profit the most and are typically higher in the criminal organization's hierarchy.

48. Based on my knowledge and experience in investigating cyber fraud schemes, the online, female persona that contacted Victim-1 is likely not the person she portrayed herself to be but, in actuality, a persona likely played by more than one person.

49.     Though originating in China, law enforcement has determined that criminal organizations utilizing Pig Butchering schemes and tactics more recently have been located in Southeast Asia, including in Hong Kong, Myanmar, Cambodia, Malaysia, Thailand, and Singapore.  In this case, Binance account records show IP access logs for Binance 4375 as having been accessed by Singapore, Thailand, and Indonesia-based IP addresses.  Binance account records show IP access logs for Binance 5891 as having been accessed by Thailand, Malaysia, and South Korea-based IP addresses.

50.     Additional review of Binance account records indicate that Binance 4375 had approximately eleven (11) approved devices and that Binance 5891 had approximately six (6) approved devices.  These "devices" refer to electronic devices that have accessed the account.  That so many different electronic devices had access to these accounts is indicative of money laundering because criminal organizations will often instruct one member of the group set up an account, utilizing their identification documentation for KYC to obtain access to the platform account.  Once that access is obtained, the account will be shared amongst several different devices and with different group members who hold different roles in the criminal organization, much like the use of a money mule.

51.     A review of the transactions containing victim funds demonstrate that the members of the organization who had control over the provided wallets employed tactics typically used in money laundering transactions and did so for the purpose of attempting to conceal the origin of the fraud proceeds.  Specifically, the fraudsters converted victim funds from the original cryptocurrency, Ether (ETH), into a different cryptocurrency, Tether (USDT).  This conversion is known as "Chain-Hopping."

52.     A further review of the transactions made by Victim-1 and the movement of these funds into Binance 4375 and Binance 5891 show additional tactics typically employed in money laundering transactions, used for the purpose of attempting to conceal the origin of the fraud proceeds.  In this case, the fraudsters obfuscated linear lines of blockchain transactions, separated victim proceeds, and co-mingled Victim-1's funds with other funds of unknown origin.  The following summary shows deposits into each Binance account containing Victim-1's funds and the amount of victim funds contained within each deposit:

  a) Binance 4375 received one deposit totaling 600,000 USDT, which contained approximately 9,910 USDT in proceeds from the scheme to defraud Victim-1; and

  b) Binance 5891 received one deposit totaling 40,000 USDT, which contained approximately 19,408 USDT in proceeds from the scheme to defraud Victim-1.

53.     The organization controlling the movement of fraud proceeds between these accounts utilized private wallet addresses for the token movements, which is also indicative of money laundering tactics used to conceal and disguise the source of originating victim funds. Private wallets are non-custodial wallets, meaning that the owner, as opposed to the host, controls the private keys and therefore all associated funding—all without institutional oversight or financial regulation.  Private, non-custodial wallets can be held in numerous forms such as wallet applications on computers and cell phones, cold storage devices not connected to the internet, and paper wallets.

54.     Additionally, the number of "hops" in these transactions appear to lack any ostensible business purpose and the fact that several hops occurred in rapid succession further

establishes probable cause to believe that the transfers were coordinated and intended to obscure the control, ownership, source, and purpose of the funds involved in said transfers.

55.     Further, a search of law enforcement databases yields numerous fraud reports associated with many of the intermediate wallets that transferred Victim-1's funds.

56.     Finally, additional activity indicative of money laundering is found upon review of the deposit history of Binance 4375 and Binance 5891, indicating that both accounts received tokens from cryptocurrency addresses associated with fraud reports found in law enforcement databases.

### *Analysis of the Subject Binance Accounts*

57.     After reviewing the graphical depiction of transfers shown in Attachment A and other facts of this investigation, I was able to identify that, after multiple intermediary transfers, a total of approximately 9,910 USDT worth of victim funds, the proceeds of wire fraud, were ultimately transferred to wallet address beginning in 0xbebd1 (as described in the above paragraphs and as depicted in Figure 5 and Attachment A) and were then laundered within, and layered into, a separate deposit totaling 600,000 USDT into Binance 4375.  I contacted Binance for information associated with this victim transaction into wallet address beginning in 0xbebd1 and obtained account records for one Binance account, with User ID xxxx4375, held in the name of DEDY (*i.e.,* Binance 4375).  The records include the email address yunming40@gmail.com and an Indonesian ID bearing the name DEDY.  Binance 4375 was opened on or about October 24, 2020.  Account records show that after the 600,000 USDT deposit containing victim funds was made on October 31, 2022, the controller of this account purchased Binance U.S. Dollar ("BUSD") cryptocurrency using USDT cryptocurrency and then purchased BNB cryptocurrency using BUSD cryptocurrency.

58.     Of the amount seized from Binance 4375, the Government is seeking to forfeit the entirety, which is 303,992.547 USDT and 100.896 BNB.  As stated above, 9,910 USDT is traceable to the proceeds of wire fraud and represents those funds transferred from Victim-1, while the remaining funds have been co-mingled with this money laundering transaction and are therefore involved in money laundering.

59.     After reviewing the visual depiction of transfers shown in Attachment B and other facts of this investigation, I was able to identify that, after multiple intermediary transfers, a total of approximately 19,408 USDT worth of Victim-1's funds, the proceeds of wire fraud, were ultimately transferred to wallet address beginning in 0x57c25 (referenced in paragraphs above and depicted in Figure 6 and Attachment B) and then laundered within, and layered into, a separate deposit totaling 40,000 USDT into Binance 5891.  I contacted Binance for information associated with this victim transaction associated with wallet address beginning in 0x57c25 and obtained account records for one Binance account, with User ID xxxxx5891, held in the name of ASAMAPORN NIL-U-BOL (*i.e.,* Binance 5891).  The records include an email address wangfei775533@gmail.com and a Thai National ID containing the name ASAMAPORN NIL-U-BOL.  Binance 5891 was opened on or about February 23, 2022.  Prior to execution of the seizure warrants and subsequent transfer from Binance, Binance 5891 held approximately 108,565.008 USDT along with small amounts of other cryptocurrencies.

60.     Of the amount seized from Binance 5891, the Government is seeking to forfeit the entirety, which is 108,551.008 USDT.  As stated above, 19,408 USDT is traceable to proceeds of wire fraud and represents those funds transferred from Victim-1, while the remaining funds have been co-mingled with this money laundering transaction and are therefore involved in money laundering.

61.    Based on the above analysis, and my training and experience, I have probable cause to believe that the Defendant Property represents the proceeds of wire fraud and/or represents funds involved in money laundering, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1956(a)(1)(B)(i) and is therefore subject to forfeiture.

### *Victim-1*

62.    On May 9, 2023, and May 11, 2023, Binance transferred the Defendant Property to the custody of law enforcement. The Defendant Property is currently being held in a USSS controlled cryptocurrency wallet.

## CONCLUSION

63.    Based on the information set forth above, I believe there is probable cause that the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (C), because it represents proceeds traceable to a scheme to defraud in violation of 18 U.S.C. § 1343 and property involved in a transaction or attempted transaction in violation of section 18 U.S.C. § 1956(a)(1)(B)(i), or property traceable to such property.

Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed this 22 day of September, 2023.

Special Agent Michael Pickett
United States Secret Service